UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**THOMAS ROBINSON,**

**Plaintiff,**

**v.**                                                                 **Case No:  6:15-cv-1896-Orl-22KRS**

**COLE LAMBERT, A. PETERKIN and J.
WASHBURN,**

**Defendants.**

_____/

## ORDER

This case is before the Court on the following:

Defendants' Motion for Summary Judgment (Doc. 68, filed
September 12, 2017); and

Plaintiff's Response in Opposition to Defendants' Motion for
Summary Judgment (Doc. 69, filed October 5, 2017).

The claims raised in the instant 42 U.S.C. § 1983 civil rights action stem from a use-

of-force that occurred against Plaintiff Thomas Robinson ("Plaintiff" or "Robinson") on

August 18, 2012 at the Volusia County Jail.  As discussed below, the defendants' motion

for summary judgment will be granted in part and denied in part.  Within twenty-one

days, Robinson shall file a pre-trial narrative statement with the Court.

## I.      BACKGROUND

Robinson initiated this action on October 5, 2015 by filing an action in the Circuit

Court of the Seventh Judicial Circuit, in and for Volusia County against Defendants Cole

Lambert, Andrew Peterkin, and Jeffery Washburn (collectively, "Defendants").  (Doc. 1

at ¶ 1).  Defendants removed the action to this Court on November 9, 2015. (Doc. 1; Doc. 2).  Thereafter, Robinson filed an amended complaint naming Volusia County Division of Corrections ("VCDC") and FNU West as additional defendants. (Doc. 20).  Robinson's second amended complaint (Doc. 28) is the operative pleading before this Court.

On July 28, 2016, Defendants filed a motion to dismiss Robinson's second amended complaint.  (Doc. 32).  The Court dismissed Defendants VCDC and West from the action.  (Doc. 48). The Court also dismissed Robinson's Fourteenth Amendment claims that were premised on the defendants' alleged falsification of reports, the assault and battery claims against Defendant Washburn, and the claims for declaratory and injunctive relief.  (*Id.*).

The following claims remain before this Court: (1) Fourteenth Amendment excessive force claims against Defendants Cole Lambert and Andrew Peterkin; (2) failure-to-intervene claim against Defendant Jeffrey Washburn; and (3) state-law claims for civil assault and battery against Defendants Lambert and Peterkin.

## II.    FACTUAL ALLEGATIONS

The relevant facts as alleged in Robinson's second amended complaint and Robinson's deposition are as follows:

On August 17, 2012, Robinson turned himself in to the Volusia County Sheriff's Office and was arrested by Deputy Weaver.  (Doc. 28 at 9-10).  The following morning, August 18, 2012, an unknown staff member called Robinson's name for his first court appearance.  (*Id.*).  Robinson, who thought the appearance was optional, responded that he was "straight" and did not want to go.  (Doc. 28 at 10; Robinson Depo. at 36).  The

officer cajoled Robinson by saying "come on.  It's a first appearance." (Robinson Depo. at

36).  Robinson replied, "I do not have a bond so I don't feel like going."  (Doc. 28 at 10).

At that point, the officer said, "Well were [sic] going to send you some motivation."  (*Id*.).

Robinson admits that the officer verbally asked him to comply several times.  (Robinson

Depo. at 37).

Shortly thereafter, Defendants Lambert, Peterkin, and Washburn entered

Robinson's cell.  (Doc. 28 at 11).  When they entered, Robinson was seated on his bunk

with his hands resting at his sides.    (*Id*.). Defendant Lambert came into Robinson's cell

and told Robinson to "come on." (Robinson Depo. at 39).  Robinson said that "[Defendant

Lambert] was trying to pull me out of bed, and I was like I'm not going to get up." (*Id*.).

In his deposition, Robinson described the incident as follows:

> And when [Defendant Lambert] – he pulled me out of bed.  And then as
> soon as I got my – my butt got off the bunk and I was sort of standing up
> halfway, he boom, slammed me up against the wall and put my hand
> behind my back.  And as soon as he did, Officer Peterkin grabbed my right
> arm and he put my hand behind my back.  And Lambert kept shoving me
> into Peterkin, and Peterkin's like, you know, trying to – I really didn't feel
> like Peterkin was really aggressive.  It was more Lambert.  He kept shoving
> me into him, but Peterkin is trying to, you know, hold me steady, so it's like
> I'm getting pushed back into him, you know what I'm saying.
>
> So they are pushing me back and forth to each other, and I'm trying to tell
> them I got a spinal cord injury, because they're doing this and it's like
> making me like go weak.  Peterkin's like, "What's that supposed to mean?"
> And before I could say anything Lambert's, "Well you're going to have
> another one."  And he shoved me hard into –
>
> . . .
>
> And he shoved me hard into Officer Peterkin.   And Peterkin like
> backpedaled.  And there was a desk that sticks out of the cell wall, and like
> they had me face down on the desk and Lambert kept shoving me into
> Peterkin and Peterkin was – like here's the top bunk (indicating) and here's

the little wall.  It's only like a little space like this much in between the desk and the bunk, so he's like stuck in between that and he's holding my arm.

. . .

Yeah.  [Peterkin] was holding – he had his right hand on this part of my arm (indicating) and his left hand on this part of my arm and he had me in like a chicken-wing-type move.  It's like – but the way he was doing it was like he was pulling my arm like this part like he was lifting it up, up away from my back and Lambert kept shoving me into him.  And it's like when [he] shoved me one good time, that's when my arm popped.  And as soon as it broke, Peterkin let go of me and ran out of the cell.

And I'm like, "You broke my arm.  You broke my arm."  And my arm was just dangling.  Lambert's like, "It's probably not broken."  Peterkin was like (indicating).  He had his hand over his mouth like he was freaking out.  He was like, "No. no.  It's broke.  It's broke." So Lambert let go of me.  And like as soon as I grabbed my arm and I picked it up and I dropped to the floor right there by my bunk.  And then – see, it's kind of like I was a little hysteric thing and I was in a lot of pain. Like my arm was like huge.  Like I was holding my arm.

And then Lambert, he grabbed me by my shirt – my shoulder of my jumpsuit and he picked me up and like how he was holding me was like – like he was holding – like if he was standing behind me, he was holding on this (indicating), but it was gripped in here like this and he was sort of picking me up like off balance, like, you know what I'm saying, and I was carrying my arm.  As he got me down the stairs and he walked me to medical, he just like kept shoving me forward, but he's holding me up at the same time.  So I'm like sort of off balance.  I really don't have balance, and he kept shoving me forward.

And he took me to medical and he sat me down on the little bench right there and he went in to talk to the nurse.  And then I see Peterkin come and he's standing there just watching.  He's like man.  He's like just freaking out.

(Robinson Depo. at 39-41).[1]  Robinson required reconstructive surgery to repair a "severe

---

[1] Robinson asks this Court to disregard the sworn statements he made in his deposition due to Counsel's alleged failure to abide by Rule 30(a)(2)(B) of the Federal Rules of Civil Procedure and because the deposition took place on May 31, 2017 while the notice for the deposition said that the deposition would take place on May 30, 2017 (Doc. 70-5 at 190). Robinson's argument is not well taken.  Robinson had through July 10, 2017 to object to

spiral fracture" of his right humorous, which required a steel plate and sixteen screws to stabilize his arm.  (Doc. 28 at 15).

Robinson seeks compensatory and punitive damages against each defendant. (Doc. 28 at 19).

### III.    MOTION FOR SUMMARY JUDGMENT

In their motion for summary judgment, Defendants Lambert and Peterkin argue that they are entitled to qualified immunity on Robinson's excessive force claims "unless Robinson can show that they used excessive force in violation of clearly established constitutional rights."  (Doc. 68 at 2).  Defendants Lambert and Peterkin also argue that they are entitled to statutory immunity on the state common law claims of assault and battery unless Robinson can show that the torts were committed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  (*Id.*) (citing Fla. Stat. § 768.28(9)).  Defendant Washburn argues that the facts alleged by Robinson do not show he was provided with notice that intervention was necessary to prevent a constitutional violation.  (*Id.* at 10).

Defendants note that Robinson admits he refused to comply with orders and argue that "[t]here is no evidence that the defendants knew or should have known a fractured arm would result from their respective actions or omissions."  (Doc. 68 at 8).  Defendants point to Eleventh Circuit case law recognizing that the use of standard police maneuvers

---

the defendants' discovery on this ground, and he did not do so. Robinson waived his right to object to the deposition.

is generally considered reasonable, even if the use of the maneuvers results in injury to the defendant.  (*Id.* at 9).

In support of their motion for summary judgment, the defendants attach the "Affidavit and Expert Report of Joseph H. Kleinman, M.D." (Doc. 68-1, "Kleinman Aff."); Robinson's deposition (Doc. 68-2; Doc. 68-3; Doc. 68-4, "Robinson Depo."); Use of Force Reports filed by the defendants (Doc. 68-4); and Robinson's Interrogatory Responses (Doc. 68-4 at 43).

Robinson responded to the defendants' motion for summary judgment and submitted a "Declaration in Opposition to Defendants' Motion for Summary Judgment." (Doc. 69; Doc. 70).

## IV.     STANDARDS OF REVIEW

### A.     Summary Judgment

Summary judgment is appropriate only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant may meet this burden by presenting evidence that would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–324.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence.  *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322, (1986).

## B.     Excessive Force

In order to establish an excessive force claim under the Fourteenth Amendment, a pretrial detainee must show the force was purposefully or knowingly used against him and that it was objectively unreasonable.  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).  Whether the force was objectively unreasonable must be viewed from the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Factors to consider include:

> [T]he relationship between the need for the use of force and the amount of
> force used; the extent of the plaintiff's injury; any effort made by the officer
> to temper or to limit the amount of force; the severity of the security

> problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 135 S. Ct. at 2473. The Court is required to "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)).

### C.    Failure to Intervene

An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 (11th Cir. 1993) ("A police officer has a duty to intervene when another officer uses excessive force."), *as amended*, 14 F.3d 583 (11th Cir. 1994); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) ("an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance").

However, a constitutional violation for failure to intervene occurs only when a plaintiff establishes that: (1) the defendant had the time and the opportunity to intervene; and (2) the defendant should have reasonably known that the other officers' conduct was in violation of the plaintiff's constitutional rights. *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919 (2000) (affirming conviction of officer for failure to intervene where the officer "observed the entire attack and had the time and ability to intervene," and

"excessive force . . . was such that every reasonable officer would have known that it was clearly in violation" of the plaintiff's constitutional rights).

### D.    Qualified Immunity

The Supreme Court has explained that "government officials performing discretionary functions" must "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This means that, on the facts alleged, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223 (2009)).

In resolving questions of qualified immunity at the summary judgment stage, courts must engage in a two-pronged inquiry.  The Court must:  (1) consider whether the facts, taken in the light most favorable to the party asserting injury, show that the defendants' conduct violated a federal right; and (2) determine whether the right in question was clearly established.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014) (resolving a qualified immunity issue in a Fourth Amendment case alleging excessive force during an arrest).  Under either prong, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 1866.   Therefore, any directly contradictory evidence must be credited in Robinson's favor.  *Id.* at 1867.

# V.     ANALYSIS

## A.     Failure to Intervene (Defendant Washburn)

Robinson's remaining claim against Defendant Washburn urges that this defendant is liable because he failed to intervene and stop Defendants Lambert and Peterkin from using excessive force against him.[2]   Robinson mentions Defendant Washburn only twice in the fact section of his amended complaint.  First, he asserts that Defendant Washburn followed Defendants Lambert and Peterkin to his cell after Robinson refused to comply with orders. (Doc. 28 at 11).  Next, Robinson asserts that, during the incident in which his arm was broken, "Defendant Washburn stood by witnessing the abusive and injurious actions being taken against the plaintiff, negligently doing nothing to intervene and cease the abusive and injurious tactics being carried out, being deliberately indifferent to the illegal actions that were transpiring."  (*Id.* at 12).  Robinson does not assert that Defendant Washburn had the ability or time to intervene.  The undisputed evidence before this Court establishes that the altercation between Lambert, Peterkin, and Robinson occurred very quickly, and that a reasonable officer observing the struggle could have concluded that the other defendants' use of force was necessary to restrain a hostile inmate.

During his deposition, Robinson was asked about his cellmate's description of the use-of-force incident in which the cellmate told investigators that Robinson fought and

---

[2] The other claims against Defendant Washburn were dismissed on February 28, 2017. (Doc. 48).

struggled with the defendants before his arm was broken.  (Robinson. Depo at 53).  The

following exchange occurred between Defendants' counsel and Robinson:

Q.    Let me ask you about that.  You're looking at the report, and I think
      your roommate wrote a couple of statements, one of which did say
      that you were fighting with the officers.

A.    It [the cellmate's statement] says, "Three officers came into my cell
      to get my roommate for court.  He said he didn't need to go and that
      he was not going to go.  Then the officer pulled him out of bed and
      he began to fight back."

Q.    Okay.  What, if anything, do you thing that you were doing that
      would make maybe the roommate think that you're fighting?

A.    Well, they were shoving me back and forth.  That would look like
      the struggle.

Q.    Do you think that what you were doing would look to somebody,
      like your roommate, like you were fighting?

A.    I think that would – them – how they were (indicating) real fast and
      making, you know, back and forth into each other looking like a
      struggle, that would look like somebody was struggling or resisting.

Q.    But you're saying is that – but what you're saying is it's not so much
      that I was struggling, it looked like that because they had both sides
      of me?

A.    Yes, sir.  Because then he says different.  Well. He just – now this is
      supposed to be more detailed.  He says, "About 7:00 my cellmate
      was called for court.  He then told me that he was not going because
      he was looking at 30 years."  I wasn't looking at 30 years.  "The
      officer called him three or four more times.  Each time he would say
      I'm good.  I'm not going.  He never left his bunk.  And each time he
      got more angry.  At one point I looked down and he was lying down
      facing the wall.  The officer then said they were on their way up to
      help him up.  He didn't respond to that, and at that point three
      officers came in my cell.  They turn on the light.  That's when I got
      up to see what was going on.  Two of the officers were standing by
      the bunk and one by the sink.  I was at that point sitting up in my
      bunk looking down.  I didn't see him, not what he was doing.  The
      officer then told him again they needed to go up for court.  He said

I'm not going.  I didn't see him until he was out of his bunk with officer holding each of his arms and him fighting back." Okay.  Like I said.

"The officer went to put his arm behind his back with him fighting and pushing the officers."  I don't see how I can be pushing anybody when they had total control of my arm.  I can understand how it would look like that because they had control of me and they were pushing me back and forth to each other.  But the doctor said I sustained a twisting injury with my arm behind my back.

Q.   Let me ask you.  You mentioned how you could understand how your roommate might have thought you were fighting because you were kind of jostling as the officers were on either side of you, right?

A.   Yes, sir.

(*Id.* at 53-55).  Robinson admits that he *appeared* to be fighting with Defendants Lambert and Peterkin.   However, Robinson asserts that Defendant Washburn should have realized that it was not a fight and that he was not resisting the officers after Lambert made his "malicious comment."   (*Id.* at 55).  Presumably, this refers to Defendant Lambert's statement—made after Robinson told him he had a spinal cord injury—that he (Robinson) was "going to have another one." (Doc. 28 at 12).  Although the statement is disturbing, Robinson does not explain how it would have necessarily alerted Defendant Washburn to the fact that Robinson was not resisting and fighting with the officers.  To the contrary, the statement would support a conclusion that Defendants Lambert and Peterkin were applying force (and making threats) because Robinson refused to obey orders and was actively resisting. *Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010).  Moreover, only 50 to 75 seconds passed from the time the defendants walked into Robinson's cell and his injury.  (Robinson Depo. at 46-47).  After struggling with Robinson, and making his comment, Defendant Washburn allegedly shoved Robinson hard into Defendant

12

Peterkin who was, by that time, stuck between the cell's desk and bunk.  This was when Robinson's arm broke.  (*Id.*).  The facts as alleged by Robinson, and supported by the undisputed evidence, indicate that even had Defendant Washburn concluded that Robinson was not fighting with or actively resisting the other defendants and even had it been possible to intervene, he did not have time to do so.

Upon review of the undisputed evidence before the Court, no reasonable jury could find that Defendant Washburn could have recognized the other defendants' alleged use of effective force, and then stopped them from using the force against Robinson during the short use-of-force incident.  *See Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008) (to be liable for failure to intervene, "it must also be true that the non-intervening officer was in a position to intervene yet failed to do so.").  Defendant Washburn is entitled to summary judgment on the remaining claim against him.

### B.       Assault and Battery (Defendants Lambert and Peterkin)

Robinson brings state-law tort claims of assault and battery against Defendants Lambert and Peterkin.  (Doc. 28).  Defendants Lambert and Peterkin assert that they are immune from these civil tort claims under Florida Statute § 768.28. (Doc. 68 at 10).  Section 768.28 states in pertinent part:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, *unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*

Fla. Stat. § 768.28(9)(a) (emphasis added).  Specifically, Defendants argue that they did not commit any tort against Robinson "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." (Doc. 68 at 10).  Defendants note that "Robinson acknowledged Peterkin did not act in an aggressive manner, and no evidence suggests either officer intended to cause injury." (*Id.*).

In his deposition, Robinson admitted that "he didn't feel like Peterkin was really aggressive" and that Defendant Peterkin was trying to hold Robinson steady while Defendant Lambert was shoving Robinson.  (Robinson Depo. at 39).  Moreover, when Robinson told Defendants that he had a spinal cord injury, Defendant Peterkin asked him what that meant whereas Defendant Lambert told Robinson that he was "going to have another one" immediately before he shoved Robinson into Defendant Peterkin.  (*Id.* at 40).  When Robinson's arm broke, Defendant Peterkin let go of Robinson and ran from his cell.  (*Id.* at 40-41).  The factual allegations before the Court refute Robinson's allegation that Defendant Peterkin acted with the requisite bad faith, wantonness, or malice under § 768.28(9)(a) to support an assault and battery claim.  Therefore, Defendant Peterkin cannot be held liable for state-law tort damages, and he is entitled to summary judgment on Robinson's state law tort claims.

However, Robinson's undisputed evidence—specifically, Defendant Lambert's alleged comment regarding giving Robinson another spinal injury—states a claim for civil assault and battery against Defendant Lambert.  A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or

14

the apprehension that such contact is imminent.  *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997).  Assault is defined as "an intentional, unlawful offer of corporal injury to another by force, or force unlawfully directed toward another under such circumstances as to create a fear of imminent peril, coupled with the apparent present ability to effectuate the attempt." *Lay v. Kremer*, 411 So. 2d 1347, 1349 (Fla. 1st DCA 1982).  That Defendant Lambert did not intend to *injure* Robinson is not an element of civil assault or battery.  At this stage of litigation, Defendant Lambert's alleged statement regarding giving Robinson "another" spinal cord injury is sufficient to defeat summary judgment.  A reasonable trier of fact could conclude that Defendant Lambert's actions were either malicious or willful and wanton; accordingly, Defendant Lambert is not entitled to summary judgment on Robinson's state-law tort claims.

### C.     Excessive Force (Defendants Lambert and Peterkin)

Defendants Lambert and Peterkin urge that summary judgment in their favor is appropriate on Robinson's excessive force claims because:  (1) Robinson acknowledges that he would not comply with the officers without the use of force; (2) Robinson's arm was particularly susceptible to fracture due to a pre-existing condition of which the defendants had no knowledge; (3) there is no evidence that the defendants knew or should have known that a fractured arm would result from their actions; and (4) they are entitled to qualified immunity.  (Doc. 68 at 7-9).

Because the defendants urge that they are entitled to qualified immunity, the Court will address both prongs of *Tolan*'s qualified immunity analysis to determine:  (1) whether the facts, taken in the light most favorable to Robinson, show that the defendants

15

violated his constitutional rights; and (2) whether the right in issue was clearly established.  134 S. Ct. at 1865-66.[3]

### (1)    Constitutional Violation

That Robinson initially refused to comply with Defendants' demand that he attend first appearance is not disputed.  In his deposition, Robinson stated:

> You already know, okay, I'm refusing.  I've refused multiple times.  I'm not coming, so you know you're probably going to have to use force to get me to come if I'm going noncompliant.

(Robinson Depo. at 67-68).  Notably, although Robinson admits that force may have been necessary to remove him from his cell, the gravamen of the instant complaint is that the amount of force was objectively unreasonable and disproportionate to what was necessary.  A detainee's conduct that makes an officer's decision to use force in a particular incident "objectively reasonable" does not automatically make the *amount* of force actually used by that officer objectively reasonable.  *See Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) ("The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances.") (emphasis in original).

Robinson asserts that he was merely sitting on his bunk when he refused to go with the officers and that Defendant Lambert grabbed Robinson, twisted his left arm

---

[3] Since there is no dispute that the defendants were acting within the scope of their discretionary authority when they sought to force Robinson to attend his court appearance, the burden shifts to Robinson "to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and internal quotation marks omitted).

behind his back, and slammed him into a wall face first.  (Doc. 28 at 11).  Thereafter,

Defendant Peterkin grabbed Robinson's other arm and twisted it behind Robinson's back.

(*Id.*).  Robinson was then shoved back-and-forth between the officers, causing Robinson

to end up in a face-down position on the cell desk.  (*Id.* at 12).  Defendant Lambert

continued to shove Robinson's body into Defendant Peterkin, and the shoving, coupled

with the twisting caused by holding Robinson's arms behind his back, resulted in

Robinson's broken arm.  (*Id.*).  Although the evidence offered by the defendants suggests

that Robinson's injury was exacerbated by "structural weakness" and "reduced bone

density,"  Dr. Kleinman's report does not establish that the amount of forced used by the

defendants was objectively reasonable.   The report merely provides a possible

explanation for the severity of Robinson's injury.  (Kleinman Aff. at 2).[4]

As to the argument that neither Defendant Lambert nor Defendant Peterkin

realized that the amount of force used would result in injury, the officers' subjective

intent is not an element of a Fourteenth Amendment excessive force claim brought by a

pretrial detainee.  *See Kingsley*, 135 S. Ct. at 2470 ("The question before us is whether, to

prove an excessive force claim, a pretrial detainee must show that the officers were

---

[4] The Court recognizes that evidence of the extent of a plaintiff's injuries is important because it provides an indication of the amount of force used. *See Wilkins*, 559 U.S. at 37. Therefore, the defendants' evidence regarding Robinson's bone condition is relevant to the trier of fact.  However, even the complete absence of a significant injury would not necessarily defeat an excessive force claim because the force used can be objectively unreasonable or disproportionate, even when very little injury occurs. *Id.* at 1178 ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

*subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable.  We conclude that the latter standard is the correct one.") (emphases in original).

Defendants have not "cited to particular parts of materials in the record" showing the absence of a genuine dispute on the issue of whether the force used against Robinson was "objectively reasonable."  *Kingsley*, 135 S. Ct. at 2473; Fed. R. Civ. P. 56(c)(1)(A). Construing the undisputed facts in Robinson's favor, as the Court must at this stage of litigation, it cannot be concluded that the officers' use of force was objectively reasonable merely because Robinson admits that he did not immediately comply with Defendants' demands. Robinson specifically said in his deposition that he did not actively resist Defendants' attempt to remove him from his cell.  (Robinson Depo. at 39).  *Tolan*, 134 S. Ct. at 1863 ("[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (second alteration in original)).

### (2)    Clearly Established

Defendants do not argue that the force used against Plaintiff was objectively reasonable.  Rather, they base their instant qualified immunity defense on the second prong of the qualified immunity analysis.  Specifically, they argue entitlement to qualified immunity because clearly established case law "[did] not hold that Lambert's use of a hammerlock transporter on an inmate who repeatedly and actively resisted

orders was a violation of constitutional rights." (Doc. 88 at 9). In support, the defendants cite the following passage from the Eleventh Circuit:

> [O]ur precedent permits the use of force even when a detainee is not physically resisting. We have held that when a prisoner created a disturbance by failing to follow a prison guard's instructions and shouting obscenities, it was not unreasonable for the guard to grab the prisoner by the throat and shove him against the prison bars. *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990). Indeed, we previously held that the use of force sufficient to break bones did not violate the Eighth Amendment under the circumstances even though the prisoner had not offered any physical resistance. *Cockrell*, 510 F.3d at 1311.

(Doc. 68 at 9) (citing *Fennell v. Gilstrap*, 559 F.3d 1212, 1218 (11th Cir. 2009)). Given that Robinson repeatedly refused to obey the officers' orders to attend his court appearance, it is undisputed that the use of some force was necessary to gain compliance. *Cockrell*, 510 F.3d at 1311 (finding that it was not unreasonable for the defendant to use some degree of force to quiet an inmate who was causing a disturbance.). Likewise, the defendants' decision to use a hammerlock transporter hold on Robinson by putting his hands behind his back was not contrary to clearly established law. *See Lloyd v. Tassell*, 384 F. App'x 960 (11th Cir. 2010) (finding it reasonable for officer to use a standard police maneuver to subdue a suspect); *Harvey v. Stuart*, 296 F. App'x 824, 827–829 (11th Cir. 2008) (holding that officers were entitled to use forceful means, including "a 'hammer lock' technique" to arrest the plaintiff, based on the fact that he "fled police and was uncooperative as the defendants tried to handcuff him," even though the evidence suggested that the plaintiff initially fled because he was "frightened" by the police, who suddenly drove up to him in an unmarked car and did not immediately identify themselves as police); *Secondo v. Campbell*, 327 F. App'x 126 (11th Cir. 2009) (officers' use

19

of force in handcuffing suspect and pushing him into patrol vehicle was reasonable, even though Secondo's arrest was for a relatively minor infraction, and he did not resist in any way).

While *Kingsley*'s "objectively reasonable" standard governs the existence of a constitutional violation, *Kingsley* was issued after the alleged use-of-force took place. Under the "clearly established" prong of a qualified immunity analysis, Robinson must show that the right involved was clearly established at the time of the putative misconduct. *Benson v. Gordon County, Ga.*, 3479 F. App'x 315, 317 (11th Cir. 2012). Therefore, in order to determine whether the "clearly established" requirement is met in this case, this Court must look to pre-*Kingsley* case law. The standard previously used in the Eleventh Circuit to determine whether a defendant used excessive force under the Fourteenth Amendment required the plaintiff to show that the defendant applied the force "maliciously or sadistically for the very purpose of causing harm." *See Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005) ("whether or not a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm.") (quoting *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987)).[5]

---

[5] Because the previous subjective element required to establish a Fourteenth Amendment excessive force violation was so extreme, the Eleventh Circuit held that a plaintiff could overcome a defense of qualified immunity merely by showing that a constitutional violation occurred. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1216-17 (11th Cir. 2009). However, that is no longer the case. Under the *Kingsley* standard, a plaintiff can show that a defendant's actions were objectively unreasonable without showing that the constitutional right forbidding the defendant's actions was "clearly established" at the time the force was applied. *See, i.e., Johnson v. Conway*, 688 F. App'x 700 (2017) (declining

The established facts against Defendant Peterkin do not suggest that he acted with "malicious intent" so as to satisfy the Eleventh Circuit's old subjective "malicious or sadistic" standard for § 1983 excessive force claims.  When Robinson told Defendant Peterkin that he had a pre-existing injury (after the defendants began shoving Robinson back and forth), Defendant Peterkin asked Robinson to explain.  (Robinson Depo. at 40). When Robinson's arm fractured, Defendant Peterkin immediately let go of Robinson and left the cell, visibly shaken and upset.  Robinson admits that Defendant Peterkin was not aggressive during the incident, but was trying to hold him steady.  (*Id.* at 39).  Although Robinson's injury was extensive, there is no way that Defendant Peterkin could have foreseen that placing Robinson's hands behind his back (even if Peterkin shoved Robinson) would result in as serious an injury as Robinson sustained.  That the severity of the injury could not have been reasonably anticipated makes it less likely that Peterkin acted "maliciously and sadistically for the very purpose of causing harm."  *Cockrell*, 510 F. 3d at 1311-12.  Defendant Peterkin's use of force against Robinson was not "so far beyond the hazy border between excessive and acceptable force that [he] had to know that he was violating the Constitution even without caselaw on point." *Johnson v. Conway*, 688 F. App'x 700, 709 (11th Cir. 2017) (citing *Priester*, 208 F.3d at 926).  Because Robinson has not shown that Defendant Peterkin violated a clearly established right in the specific context of this case, Peterkin is entitled to qualified immunity.  *Johnson*, 688 F. App'x at 709.

---

to consider the "objectively reasonably" *Kingsley* standard because Plaintiff could not show that the force used was "malicious and sadistic" under the prior standard).

More troubling is Robinson's allegation that Defendant Lambert slammed Robinson face-first into the cell wall and shoved him into Defendant Peterkin after Robinson told him of his spinal injury and after Defendant Lambert allegedly told Robinson that he was "going to have another one." (Doc. 28 at 11).[6]  Although a very close call, it is these actions—coupled with the use of the hammerlock transporter hold—that precludes qualified immunity for Defendant Lambert.  The Eleventh Circuit has long been clear that "[p]rison officials step over the line of constitutionally permissible conduct if they use more force than is reasonably necessary in an existing situation." *Ort v. White*, 813 F.2d 318, 325 (11th Cir. 1987); *Hope v. Pelzer*, 536 U.S. 730, 743 (2002) (noting that the reasoning of this Circuit's holdings, even if a case did not involve the same precise facts, sends a sufficient message to reasonable officers in this Circuit for the purposes of the "clearly established analysis").  *Ort* also establishes that a constitutional violation occurs when "prison officers continue to employ force or other coercive measures after the necessity for such coercive action has ceased." *Ort*, 813 F.2d at 327; *see also Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991) ("The basic legal principle is that once the necessity for the application of force ceases, any continued use of harmful force can be a violation of the Eighth and Fourteenth Amendments.").  Defendant Lambert's statement that Robinson would get "another" spinal cord injury after Robinson said he has a condition suggests that the final shove that resulted in Robinson's broken arm was not

---

[6] Threatening comments are circumstantial evidence of a mental state that can be considered in determining the intent underlying the use of force. *Bozeman*, 422 F.3d at 1272.

done to restore order, but sadistically to cause harm.  Robinson's version of the facts —

applied to the general principles of *Ort* and *Williams* — demonstrates a violation of clearly

established law sufficient to pass that summary judgment stage.  Accordingly, summary

judgment is denied as to Defendant Lambert.

## VI.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.     The Motion for Summary Judgment (Doc. 68), filed by Defendants

Washburn, Lambert, and Peterkin is **GRANTED** in part and **DENIED** in part.

  a.     The motion is granted as to Defendants Washburn and Peterkin.  These

  defendants are entitled to summary judgment as a matter of law on all of

  Robinson's claims, and the claims against them are dismissed with

  prejudice.

  b.     The motion is denied as to Robinson's excessive force claim against

  Defendant Lambert.  The motion is also denied as to Robinson's state-law

  assault and battery claim against Defendant Lambert.

2.     Robinson shall file a pretrial narrative statement within **TWENTY-ONE**

**(21) DAYS** from the date on this Order in compliance with this Court's March 16, 2017

Order (Doc. 52).  Thereafter, Defendant Lambert shall have **FOURTEEN (14) DAYS** to

file a pretrial narrative statement.  If Robinson fails to file a pretrial narrative statement,

the defendant is not required to file or serve a pretrial narrative statement, and he shall

promptly notify the Court of Robinson's failure to comply.

23

3.     The **Clerk of Court** is directed to provide Robinson with a copy of the scheduling order at docket entry 52.

**DONE** and **ORDERED** in Orlando, Florida on February 13, 2018.


ANNE C. CONWAY
United States District Judge


Copies furnished to:

Counsel of Record
Unrepresented Parties
SA: OrlP-4
Encl: Docket entry 52

24